IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ORLANDO S. LOPEZ,

       **Plaintiff,**

vs.                                                                                          Civil No. 04-1172 RLP

JO ANNE B. BARNHART,
Commissioner, Social Security
Administration,

       **Defendant.**

## MEMORANDUM OPINION AND ORDER

Plaintiff, Orlando S. Lopez ("Plaintiff" herein) filed an application for Disability Income benefits on June 15, 1999. Plaintiff's application was denied at the first and second levels of administrative review. A hearing was conducted by an administrative law judge on October 4, 2000, and a decision denying Plaintiff's claim was entered on March 14, 2001. The Appeals Council reversed the ALJ's decision, and remanded for additional proceedings. A second administrative hearing was conducted on January 17, 2002. Plaintiff's claim was again denied in a decision entered April 16, 2002. The Appeals Council declined review on August 16, 2004.

The matter before the court is Plaintiff's motion to reverse or remand the administrative denial of his claim.

**I.**    **Standard of Review.**

The court reviews the decision of the Commissioner to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision.[1] The Supreme Court has

---

[1] Castellano v. Sec'y of Health & Human Servs., 26 F.3d 1027, 1028 (10th Cir.1994).

held that "substantial evidence" is "more than a mere scintilla" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[2]  In reviewing the record to determine whether substantial evidence supports the Commissioner's decision, the court may neither reweigh the evidence nor substitute its discretion for that of the Commissioner.[3]  Evidence is not considered substantial "if it is overwhelmed by other evidence--particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion."[4]

The court also reviews the decision of the Commissioner to determine whether the Commissioner applied the correct legal standards.[5]

## II.     Factual Background

Plaintiff was born on March 13, 1947.  (Tr. 57).  He is a high school graduate (Tr. 68), and was employed as an iron worker from 1966 until March 1998.  (Tr. 57, 62-63, 68, 193).  He alleges disability due to a combination of physical impairments including injuries to his right foot and left knee, and hand,  neck, shoulder and back problems.  (Tr. 62, 495).  Plaintiff testified that he had constant pain in his neck, left knee, left shoulder and right foot which prevented him from standing more than fifteen minutes, walking more than two blocks or sitting more than fifteen minutes at a time, that his arms fall asleep and his hands go numb, that he can't pick things up because of difficulty

---

[2] Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

[3] Qualls v. Apfel, 206 F.3d 1368, 1371 (10th Cir.2000) (citing Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir.1991)).

[4] Knipe v. Heckler, 755 F.2d 141, 145 (10th Cir.1985) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir.1983)).

[5] Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir.1994); Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir.1994).

grasping and gripping with his hands, that he cannot climb ladders or work overhead, that he has difficulty bending, squatting, kneeling and walking down stairs. (Tr. 479-480, 489, 494, 496-499). He also testified that he was able to lift twenty to thirty pounds without pain, drive, pick up after himself at home, carry firewood into the house and type at a computer for up to fifteen minutes at a time. (Tr. 482, 484-486, 497).

    A.    Cervical Spine.

Plaintiff testified that his most serious problems related to his neck. (Tr. 489). The medical record establishes that he suffers from cervical spondylosis [6] and C5-6 and C6-7 foraminal stenosis[7] with radiculopathy, causing neck and arm pain. This condition prevents him from engaging in overhead work, and precludes employment as an ironworker. (Tr. 261, 329). Plaintiff has treated this condition with medication, physical therapy, traction, and use of a TENS unit (See. e.g.,151, 205, 204), but continues to have verifiable complaints of pain and restricted motion of the neck. (Tr. 329, 336, 323, 259).

    B.    Right Foot, Ankle and Knee.

Plaintiff broke his right foot in 1996, and his right ankle in March 1998. (Tr. 258, 192-194). As of June 29, 1998, his treating orthopedic surgeon, Dr. William Richie, released him to a work

---

[6] A degenerative joint disease affecting the cervical vertebrae, intervertebral disks, and surrounding ligaments and connective tissue, sometimes with pain or paresthesia radiating down the arms as a result of pressure on the nerve roots. Dorland's Illustrated Medical Dictionary 1564 (28th ed.1994). Plaintiff's signs and symptoms consisted of tenderness and spasm in the trapezius area, and pain radiating to his left shoulder and arm. X-rays indicated nonspecific straightening and moderate degenerative disc disease at C5-6 and C6-7, some encroachment of the left-sided neural foramina at C6-7 and minimal osteophytic spurring protruding into the right C6-7 neural foramen. (Tr. 126-127, 138-139).

[7] A narrowing of an aperture or perforation through a bone or a membranous structure. Stedman's Medical Dictionary 674, 1673 (26th ed.1995).

hardening program, with lifting limited to thirty pounds and no climbing of ladders and poles. (Tr. 190). Plaintiff continued to complain of heel, ankle and foot pain. (Tr. 189, 187). On November 6, 1998, he was referred for a custom orthotic device to treat ankle pain caused by tendonitis and osteoarthritis. (Tr. 186). As of February 1999, Dr. Richie felt that despite these problems, Plaintiff could perform medium level work, with some modification for balance problems. (Tr. 184). Plaintiff was evaluated by Laura Mitchell, M.D., an associate of Dr. Richie, on March 22, 1999. Her examination confirmed restricted ankle motion (dorsiflexion) and non-specific tenderness along the anterior ankle. She indicated that Plaintiff had a minimal right ankle injury which had left him with chronic pain superimposed on joint arthrosis. She felt he would need to find alternate employment at the medium-duty level, and provided him samples of anti-inflammatory medication. (Tr. 90-91).

Plaintiff returned to Dr. Mitchell on May 27, 1999, after developing significant effusion, crepitus and pain with movement of the left knee. Dr. Mitchell diagnosed synovitis. (Tr. 182-183). By September 1999, an MRI of the left knee indicated definite abnormalities[8] requiring surgical intervention. (Tr. 112). Arthroscopic surgery on November 26, 1999, corrected a tears of the medial meniscus anterior cruciate ligament. (Tr. 213-214). An examination by Thomas Cohn, M.D., a specialist in rehabilitation and occupation medicine on February 2, 2000, indicated that Plaintiff's knees had full range of motion without pain, swelling, erythema, laxity or instability. (Tr. 149). Dr. Cohn's notes indicate that Plaintiff's ankle and foot had normal range of motion, arch and positioning, with no significant degenerative changes. Id. On April 11, 2000, Plaintiff complained of only occasional knee pain. (Tr. 207). He was evaluated by Eugene Toner, M.D., that same month. Dr.

---

[8]Complex tear of the posterior horn of the medial meniscus, moderate to large joint effusion, large popliteal cyst, mild to moderate strain of the MCL, synovial cyst vs. ganglion cyst of the posterior and lateral aspect of the knee.

4

Toner noted that Plaintiff had an antalgic gait, favoring his right foot, decreased strength in the quadriceps and hamstring muscles of both legs with no atrophy, and x-ray evidence of degenerative arthritis of the right foot caused by his prior foot fractures. (Tr. 260). Dr. Toner indicated that Plaintiff was limited to walking no more than two hours due to arthritis in his right foot, and pain in his left knee. Otherwise, he did not restricting his sitting or lifting tolerances. (Tr. 261, 265-266).

In December 2000 Plaintiff complained of foot pain and was advised to obtain new boots and inserts. (Tr. 307-308). He returned to the VA Hospital in June 2001 complaining of ankle and foot pain when weight bearing. He stated that he had stopped wearing orthotics. Evaluation demonstrated that the pain was completely alleviated when his stance was corrected. The podiatrist recommended injections and orthotics, which Plaintiff declined. (Tr. 305). Plaintiff was again examined for complaints of increased foot pain the following month at the VA podiatry clinic. He stated that his right foot did not hurt as much when he wore orthotics, but that he didn't wear them all the time because his shoes wore out and he didn't want to replace them. He was instructed to wear orthotics at all times. (Tr. 363-364). He returned to the podiatry clinic in October 2001, with complains of continued pain. He advised the podiatrist that he had ordered a replacement orthotic from a private prosthetist. (Tr. 360).

C.  Hands

Neurologic testing conducted in 1993 for complaints of pain, numbness and weakness of Plaintiff's left arm indicated possible ulnar nerve disease. (Tr. 154, 156, 152, 164). Plaintiff was evaluated at the VA Hospital on May 25, 1998, for complaints of pain in both hands, without numbness or tingling. Exam was normal except for enlargement of the PIP joints, which were the foci of his pain. He was advised to take Tylenol four times a day for osteoarthritis (Tr. 132).

Examination of Plaintiff's hand function by Dr. Cohn in January 2000 was completely normal.[9] When examined by Dr. Toner on December 6, 2000, Plaintiff complained that both of his hands fell asleep, the left hand being more involved than the right. Examination indicated decreased grip strength but normal pinch and oppositional strength, with no limitation in fine manipulation. (Tr. 258-259, 266).

D.   Low Back

July 11, 2000, Plaintiff was seen at the VA Hospital for complaints of chronic low back pain. X-rays disclosed significant degenerative disc changes at L1-2 and lesser changes at L5-S1.[10] Follow up evaluation on July 22 indicated that the pain was nonradiating, that it had flared up over the prior 4 months, and improved with movement. The pain was felt to be mechanical, and Plaintiff was referred for pool therapy (Tr. 243). Plaintiff experienced another flare up of low back pain in September 2000. He was treated with muscle relaxants, ice, pain medication and TENS unit. (Tr. 238-239). Plaintiff completed the pool therapy for his low back complaints In December 2000. (Tr. 206-207). Further pool therapy was discontinued due to Plaintiff's failure to attend. (Tr. 360-361).

**III.   Vocational Testimony**

The ALJ received testimony from a vocational expert ("VE" herein) at the administrative

---

[9] "The hands showed no significant degenerative changes, with no swelling, erythema, or tenderness of the joints. The patient had good range of motion of the fingers and joints of the hands. There was no instability or laxity about the ligaments or joints. There was no tenderness at the wrist or along the tendons on palpation, and the Tinel's, Phalen's and Finkelstein's tests were unremarkable in the hand and wrist bilaterally." (Tr. 148).

[10] Significant degenerative disc changes at L1-2 with reactive sclerosis, hypertrophy change and a vacuum phenomenon. Minimal posterior disc narrowing at L5-S1. L5 (right) with unilateral lysis of the pars at L5 on the right. L5 facet arthropathy. (Tr. 251).

hearing. The VE stated that Plaintiff's past work as an ironworker (structural steel worker, DOT 801.361-014), was a heavy, skilled occupation (SVP-7[11]), and that Plaintiff had acquired transferable skills while engaged in that occupation.[12] (Tr. 500-501). The ALJ then asked the VE to assume an individual of Plaintiff's age, education and past work experience, who could lift twenty pounds occasionally, ten pounds frequently, could stand for two hours in an eight hour day, could sit for up to six hours in an eight hour day with normal breaks, could not stand or walk for prolonged periods of time, could not work overhead, could not climb ladders, poles or scaffolding, but could occasionally balance, climb stairs and ramps, crawl, crouch, and kneel. The VE testified that such an individual could perform the following jobs:

> Cashier (DOT 211.462-010), light unskilled. Three million in the national economy, 15,000 in the regional economy.
>
> Small products assembler (DOT 706.684-022, light, unskilled; limited to those positions which allowed a sit/stand option. After reduction for those permitting sit stand option: One-hundred twelve thousand five hundred in the national economy, 75-100 in New Mexico.
>
> Office helper (DOT 239.567-010), light, unskilled. Two and one half to Three million in the national economy, 11,000 in New Mexico.

(Tr. 501-502)

---

[11] The Department of Labor's Dictionary of Occupational Titles defines SVP as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." 1009 (4th ed.1991). The time needed is ranked on a scale from 1 to 9, with 9 representing the most time needed to learn a job. A level 7 job requires "[o]ver 2 years up to and including 4 years" to learn." Id.

[12] The use of tools, equipment or machinery, the ability to read drawings or blue prints, the use of math or geometry to measure, cut calculate materials or dimensions, and the ability to work accurately and precisely. (Tr. 501). The court notes, however, that neither the ALJ nor VE investigated the skills actually acquired by Plaintiff. See Dikeman v. Halter, 245 F.3d 1182, 1185 (10th Cir.2001) (" 'Neither an occupational title by itself nor a skeleton description [of a job] is sufficient to document the claimant's acquisition of skills. Job titles, in themselves, are not determinative of skill level.' "). Plaintiff testified that he was able to read blue prints to some extent, but denied the ability to draw blueprints or use geometry. (Tr. 503).

## IV.     The ALJ's Decision.

The ALJ found that Plaintiff suffered from severe impairments which did not meet or equal a listed impairment, and that he could not return to his past relevant work. These findings are not challenged. The ALJ discounted Plaintiff's credibility regarding functional limitations and severity of pain, citing to:

- -- Plaintiff's activities, which include bringing in wood for the stove, performing housework on a limited basis, using a computer and driving;

- -- Plaintiff's failure to use orthotics as prescribed, when consistent use of orthotics reduced foot pain;

- -- Plaintiff's testimony that his back pain reduced with movement;

- – Dr. Toner's opinion that Plaintiff's ability to sit and to lift was not restricted, and that he could walk for two hours in eight;

- – Dr. Cohn's opinion that Plaintiff's neck and left shoulder/arm pain would improve with use of medication and TENS, combined with the absence of any indication from any physician that those modalities of care were not effective.

The ALJ found that Plaintiff retained the residual functional capacity to occasionally lift up to 20 pounds, frequently lift 10 pounds, stand and walk for two hours in an eight hour day provided he not engage in any prolonged standing or walking and would be able to alternate sitting and standing, that he could sit for eight hours in an eight hour day, and that he could never perform overhead work or climb ropes, ladders or scaffolding.

Finally, citing to the Medical-Vocational Guidelines and to the testimony of the VE, the ALJ found that Plaintiff was functionally able to perform jobs existing in the national economy, citing to the three jobs listed by the VE.

## V.     Issues Raised on Appeal

Whether the ALJ's credibility determination was supported by substantial evidence and the application of correct legal principles.

Whether the ALJ's vocational assessment was defective because the ALJ failed to address the issue of transferability of skills.

Whether the ALJ failed to apply correct legal principles by presenting an incomplete and inaccurate hypothetical to the VE.

**VI.    Discussion**

    A.    Credibility.

The determination of credibility is the provence of the ALJ as the trier of fact, and will not be upset when supported by substantial evidence.[13] If a claimant's testimony regarding disability, pain or functional limitation is rejected by the ALJ, he must articulate specific reasons for questioning that testimony.[14] The ALJ satisfies this requirement by stating the specific evidence he relies upon.[15]

The evidence cited by the ALJ satisfies the legal requirements of Kepler v. Chater and Qualls v. Apfel, and constitutes substantial evidence in support of his finding that Plaintiff was not totally credible. Plaintiff's activities indicate that he retains a functional ability greater than he described in his testimony. Further, the ALJ could properly view his foot pain as less severe than he claimed, in light of his failure to follow prescribed medical care which alleviated that pain.

    B.    Vocational Assessment

    1    Transferability of skills

---

[13] Diaz v. Secretary of Health & Human Servs., 898 F.2d 774, 777 (10th Cir. 1990).

[14] See Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

[15] Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000).

Plaintiff argues that the ALJ's step five finding is not supported by substantial evidence because he failed to discuss the specific skills he acquired in prior work, and how those skills are transferable to the jobs cited by the VE.

Plaintiff was fifty-four years old at the time of the hearing, which is closely approaching advanced age.[16] He has a high school education and prior work experience as an iron worker. The VE testified that Plaintiff had acquired specific transferable skills[17], but did not discuss how those skills were transferable to the jobs she listed. The jobs she listed are all unskilled jobs. "Skills are not transferable to unskilled work because, by definition, unskilled work requires no skills."[18] Because the jobs identified by the VE were unskilled jobs, transferability of skills is not at issue.

> . . . (T)ransferability (of skills) will be decisive in the conclusion of "disabled" or "not disabled" in only a relatively few instances, because, even if it is determined that there are no transferable skills, a finding of "not disabled" may be based on the ability to do unskilled work.[19]

2       Hypothetical question

Plaintiff contends that the hypothetical question posed to the VE was incomplete and inaccurate in that is was consistent with sedentary, not light work, and failed to include all Plaintiff's limitations. The hypothetical included exertional abilities in both the sedentary and light range: The assumed capacity to lift was in the light range[20], the assumed capacity to stand, walk and sit was in

---

[16]20 C.F.R. §1563(d).

[17]The VE stated that Plaintiff acquired transferable skills in the use of tools, equipment or machinery, the ability to read drawings or blue prints, use math or geometry to measure, cut, calculate materials or dimensions, and work accurately and precisely. (Tr. 501).

[18]Terry v. Sullivan, 903 F.2d 1273, 1277 (9th Cir. 1990).

[19]Social Security Ruling 82-41, 1982 WL31389, *1.

[20]Social Security Ruling 83-10; 20 C.F.R. §404.1567(b).

10

the sedentary range[21]. Further assumed restrictions included the inability to reach, lift or work overhead, stand or walk for prolonged periods, inability to climb, and all other postures limited to occasional[22] only. (Tr. 501). The VE testified that a person of Plaintiff's age, education and prior work experience, with these physical limitations, could perform the jobs of cashier and office helper both of which permitted a sit/stand alternative, and the job of small produces assembler, a percentage of which permitted a sit/stand alternative. (Tr. 501- 502).

If Plaintiff were limited to only sedentary work, application of the Medical Vocational Guidelines would mandate a finding of disability.[23] Substantial evidence supports the finding that his residual functional capacity exceeds that of sedentary work in terms of his ability to lift and carry. (Tr. 258, 261, 265, 497). Because Plaintiff's residual functional capacity did not precisely fit into any exertional category, the ALJ properly did not rely on the Medical Vocational Guidelines in determining disability, and obtained testimony from a VE.[24]

Hypothetical questions to a vocational expert must reflect with precision all of a claimant's impairments.[25] Those impairments, however, must be born out in the evidentiary record.[26] A

---

[21] Social Security Ruling 83-10; 20 C.F.R.§ 404.1567(a).

[22] "Occasionally" means occurring from very little up to one-third of the time. Social Security Ruling 83-10.

[23] 20 C.F.R., Pt. 404, Subpt. P, App. 2, Rule 201.14; see also id. § 201.00(g).

[24] Social Security Ruling 83-12, 1983 WL 31253, at *2.

[25] Hargis v. Sullivan, 945 F.2d 1482, 1492 (10th Cir. 1991).

[26] Evans v. Chater, 55 F.3d 530, 535 (10th Cir. 1995).

claimant's testimony alone cannot establish a nonexertional impairment.[27]

Plaintiff contends that the hypothetical question failed to include limitations in his ability to stand or sit more than 15 minutes at a time, difficulty bending and putting his head down, kneeling, climbing stairs, and dropping or holding small items.  The jobs identified by the VE included limitations in Plaintiff's ability to stand, standing limited to a maximum of two hours per day, with no prolonged standing or walking, and the requirement that any job permit a sit/stand option.  (Tr. 501-502).  This limitation is supported by Plaintiff's testimony that he could stand for fifteen or twenty minutes at a time and walk for a quarter of a mile (Tr. 258, 466) combined with Dr. Toner's assessment that standing or walking was limited to two hours in an eight hour day.  (Tr. 265-266).  The ALJ did include limitations in Plaintiff's ability to kneel and climb stairs.  (Tr. 501).  The examination by Dr. Toner provides substantial evidence that Plaintiff does not have manipulative problems that would impact his residual functional capacity.  (Tr. 259, 266).  Plaintiff advised Dr. Toner that he was able to bend, and he testified that he could bend to an extent.  (Tr. 258, 466-467).  The only evidence of difficulty putting his head down comes from Plaintiff's testimony[28].  As previously stated, a claimant's testimony, standing alone, is insufficient to establish a nonexertional impairment.  (See footnote 27).

Based on the foregoing I find that the ALJ applied correct legal principles in posing the hypothetical question to the VE, and that the limitations contained in the hypothetical question were those borne out by the evidentiary record.

---

[27]See Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990) (per curiam) (subjective complaints alone insufficient to establish disabling pain.).

[28]Q: "Any difficulties . . . putting your head down?"
   A: "Yes."  (Tr. 499).

## VII.     Conclusion.

For these reasons Plaintiff's Motion to Reverse and Remand is denied, and the decision of the Commissioner denying Plaintiff's application for Disability Income Benefits is affirmed.

```
                    RICHARD L. PUGLISI
              UNITED STATED MAGISTRATE JUDGE
                    (sitting by designation)
```